# EXHIBIT 2

ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-10833

NICHOLAS E. HURLIN,      |

       Plaintiff      |

vs.                      |

TOWN OF ROWLEY,          |

       Defendant      |

DEPOSITION OF:  NICHOLAS E. HURLIN

BRODY, HARDOON, PERKINS & KESTEN

One Exeter Plaza

12th Floor

Boston, MA 02116

October 8, 2004

Virginia Dodge
Registered Professional Reporter

DUNN & GOUDREAU

2

```
APPEARANCES:


Representing the Plaintiff:

     PIERCE & MANDELL, P.C.
     11 Beacon Street
     Suite 800
     Boston, MA 02108-3002
     BY:  THOMAS E. KENNEY, ESQ.
     (617) 720-2444


Representing the Defendant:

     BRODY, HARDOON, PERKINS & KESTEN
     One Exeter Plaza
     12th Floor
     Boston, MA 02116
     BY:  PAMELA J. FITZGERALD, ESQ.
     (617) 880-7100
```

1  this all one, kind of like one case.

2      I'm sure we have separate file folders like you have

3  there.

4  Q.    Did you raise your voice to Wendy or anyone else at

5  the board of health that day?

6  A.    I don't believe I raised my voice.

7  Q.    Were you asked to leave the office?

8  A.    I think somebody said -- after I had started to

9  leave the office, somebody said, "Please leave the

10  office," and I was on my way out the door at the time.

11  But I don't believe it was Wendy that said that.

12  Q.    Do you know who it was that asked you to leave?

13  A.    I think it was the agent Alyssa Rusiecki.

14  Q.    Did you have any conversations with Alyssa Rusiecki

15  that day, January 8, 2001?

16  A.    I might have turned around and said, "Oh, there you

17  are," or something to that effect.  "You're the person

18  that has the knowledge I need.  I'd like to ask, would you

19  reply and help me get some answers to Title 5 questions?"

20  And I think she rebuffed me.

21  Q.    Had you, prior to January 8, 2001, had conversations

22  with Alyssa Rusiecki with regard to the property at

23  27 Central Street?

24  A.    I have tried to have conversations with her many,

```
 1   many a time and been rebuffed.

 2   Q.    Did you ever raise your voice with Alyssa during any

 3   of those prior attempts at conversation with her?

 4   A.    I think that would be subjective.  I think --

 5             MR. KENNEY:  The question is your opinion.

 6   A.    My opinion, I don't believe that I -- that I raised

 7   my voice overly than my normal passionate self, so --

 8   Q.    (By Ms. Fitzgerald)  Had you ever been asked to

 9   leave the board of health office prior to January 8, 2001?

10   A.    I have -- yes.

11   Q.    And do you recall how many occasions you've been

12   asked to leave the board of health office prior to

13   January 8, 2001?

14   A.    I can't recall how many.

15   Q.    Was it more than five times?

16   A.    I couldn't recall, but it's possibly about that.

17   Q.    About that?  You mean about five times?

18   A.    Yeah.  I'm not sure.  It's been -- it had been a few

19   times.

20   Q.    And on those prior occasions when you were asked to

21   leave the board of health office, do you recall who it was

22   that asked you to leave?

23   A.    Probably Alyssa or Wendy or --

24   Q.    Do you know why you were asked to leave --
```

```
 1        individual questions she asks.
 2   A.    Okay.  Yes.  I got a call from him.
 3   Q.    (By Ms. Fitzgerald)  And about what time did you get
 4   that phone call?
 5   A.    I think it's somewhere 4, 4:30, quarter to 5.
 6   Q.    Did he call you, or did you call him?
 7   A.    He called me at my request.
 8   Q.    And between the time you left the board of health
 9   office in the morning and the time you received the phone
10   call from Charlie Costello that afternoon -- and again,
11   I'm talking about January 8, 2001 -- did you have
12   conversations with anyone else from the Town of Rowley
13   during the day?
14   A.    Yes, I did.
15   Q.    Who did you speak with?
16   A.    I went directly to the selectmen's office.
17   Q.    After leaving the board of health, you went to the
18   selectmen's office?
19   A.    Selectmen's office.
20   Q.    And what did you go to the selectmen's office for?
21   A.    To make a complaint.
22   Q.    And what time was that?
23   A.    Maybe it was 9:00.
24   Q.    And who were you complaining about?
```

DUNN & GOUDREAU

A.    I was complaining about the board of health and not

receiving and not being -- being refused service that I

needed in order to make repairs and make a design for

27 Central Street.

Q.    And did you speak with somebody at the board of

selectmen's office?

A.    Yes.  I did.

Q.    And who did you speak with?

A.    I'm not quite sure.  I don't remember the name.  I

believe I asked for the administrator or --

Q.    Did you actually speak with the town administrator

that day?

A.    I spoke with somebody.

Q.    Was it a man or woman?

A.    It was a woman.

Q.    And you don't know what her name was?

A.    I probably have it written -- I'm sure I have it in

my notes now.  I just can't recall.  They have a number of

people there, and it's hard to keep track of the different

ones.

Q.    You know who the town administrator is for the Town

of Rowley?

A.    I do now.

Q.    Was that the person you spoke with on January 8,

1    sometimes whatever I've got handy at the time.  I go out

2    in my car.  If I've got something on the back of

3    envelopes, then I'll transfer it later on.

4    Q.    Do you ever transfer it onto a computer so that it's

5    in typed form?

6    A.    No.  Not really.  Sometimes.  Some of them, I have,

7    and some, I haven't.  There's a possibility there's some

8    both ways.

9    Q.    Other than this one woman, did you speak with anyone

10   else?  Do you remember who else you spoke with at the

11   board of selectmen that morning?

12   A.    There might have been somebody else there, too.  I'm

13   not positive, because I've been down there for other

14   business, and they usually have somebody that's sitting at

15   a desk.  And sometimes they get -- and there's somebody in

16   an inner office, and they will go and get this person.

17   And I believe this person came out of the inner office.

18   So there most likely was somebody else there.

19   Q.    And the person that you spoke with, what did she

20   tell you?  Did she indicate that she would refer your

21   complaint to Mr. Costello?

22   A.    She did.  She was rather surprised that they hadn't

23   gotten back to me at my several requests to call.

24   Q.    And between the time you -- and after having this

1  conversation at the board of selectmen's office, you then

2  left the board of selectmen's office?

3  A.   Yes, I did.

4  Q.   And did you go to any other town office in the Town

5  of Rowley that day before you actually spoke with

6  Mr. Costello?

7  A.   I don't recall at this time.  I may have.  I don't

8  recall at this time.

9  Q.   At some point on January 8, 2001, you did receive a

10 phone call from Charlie Costello, correct?

11 A.   Yes, I did.

12 Q.   And where were you when you received that phone

13 call?

14 A.   I was in the kitchen at 441 Central Street.

15 Q.   Was anyone else present when you received that phone

16 call?

17 A.   Nathalie Cook was present.

18 Q.   At 441 Central, that's your home?

19 A.   Yes.

20 Q.   About what time did Mr. Costello call you?

21 A.   I believe -- I think it was somewhere between 4 and

22 5.  4:30.

23 Q.   And just so I'm clear, between the time you left the

24 board of selectmen's office in the morning at the time you

1    What was the question again?  How much do you want

2  me to tell you?

3  Q.    What I want to know basically is what you said to

4  him and what he said to you, what you recall about the

5  conversations.

6  A.    Well, I asked him to give us assistance in getting

7  the situation resolved.  And I believe I started to tell

8  him, too, that I was thinking that -- I was hoping that he

9  would change his procedures and work with us, work with

10  people in general.  And I think I mentioned to him that

11  they -- I was hoping that they would look at the way they

12  operate in promulgating their laws and rules and

13  regulations.

14    And I think I told him it's a possibility with

15  today's world that it could be a safety issue.  The fact

16  that they hinder people from resolving their problems,

17  actually obstruct them from resolving the problems, could

18  be a safety issue and so forth.  And I think I mentioned

19  Colebrook and Wakefield.

20    I think he wanted to know what I meant -- what they

21  were -- I couldn't even remember whether it was Woburn or

22  Wakefield to begin with or what town.

23    So he asked me about, "What do you mean by

24  'Wakefield'?"

1    And then I think I may have said something to the

2    fact, well, it's -- when he asked me to explain that, that

3    I'm not -- I think I said to him something about "I don't

4    want you to take this in any threatening way or anything

5    like that."

6    And I'm probably using this kind of a voice as I'm

7    saying to him that, but it was -- when we had this

8    Colebrook and Wakefield event which involved the disaster

9    that happened, whatever it was, that -- I don't know if

10    you remember that yourself.

11    And the reason that I mentioned that and the reason

12    why this matter came to my mind is because Nathalie Cook's

13    daughter worked with and was killed by this fellow in

14    Wakefield or that incident only three weeks before.  And

15    we had talked about that in our family, amongst the

16    families, two or three or four times.

17    And then it occurred to me that the situation that I

18    was involved with with the Town of Rowley, it's a

19    possibility that a situation could occur like that in the

20    Town of Rowley.

21    So I had this -- I felt a need to -- to relate this

22    to the administrator, the one that's responsible for

23    administrating the health laws.  And he was the only

24    person and selectmen would be the only person that would

1    be the appropriate persons to address that issue.

2        So we had that conversation, and he started saying

3    that was -- "Well, I'm taking that as a threat."

4        And I think I -- in the same voice that we're

5    having, I said, "Listen, you shouldn't be taking that as a

6    threat because it's not a threat.  I'm talking to you.

7    You're -- as a -- you're the boss here.  It's something

8    you need to look at."  And still does, by the way, need to

9    look at that.

10       "You need to look at it now because the way you're

11   operating, the way the board of health is operating, you

12   are -- if you picked on the wrong person the way they

13   picked on me, who knows whose triggers -- who knows when

14   something would trigger something like that that would

15   happen in those towns.  It was a terrible event, and we

16   certainly don't want it to happen here in Rowley or any

17   other town."

18   Q.   Did you say that Ms. Cook's daughter was in --

19   A.   Had worked with one of the workers that was killed.

20   Q.   Was she present when the shooting occurred in

21   Wakefield, Ms. Cook's daughter?

22   A.   I don't believe so.  No.

23   Q.   Do you recall stating something to Charlie Costello,

24   the fact that you don't want what happened in Wakefield to

1  happen in Rowley?

2  A.    I didn't say it like that.  I said it like I just

3  said it to you.  I may have said -- you know, we certainly

4  don't want -- we certainly do not want anything to happen

5  in any town.

6  Q.    When you mentioned -- when you talked about

7  "Wakefield," you're talking about the shooting that

8  occurred in the Edgewater complex in Wakefield,

9  Massachusetts on or about December 26, 2000?  Correct?

10  A.    I wouldn't put it in those words.  I'm talking about

11  the disaster that happened in Wakefield.  But the only

12  people I have heard use the words that you have used are

13  your people and the newspaper, trying to sell newspapers.

14  Q.    Well, seven people were murdered in Wakefield --

15  A.    That's correct.

16  Q.    -- on December 26, 2000; is that correct?

17  A.    I don't know how many.

18  Q.    Several people were murdered, correct?

19  A.    I believe so.

20  Q.    And so your reference when you were speaking to

21  Mr. Costello about "Wakefield," you were referring to that

22  shooting, correct?

23  A.    And Colebrook.

24  Q.    I'm just asking you about the Wakefield incident

```
 1   right now.

 2   A.    Yes.  I'm referring to that incident.

 3   Q.    And when you referred to the word "Colebrook,"

 4   you're referring to another shooting that happened several

 5   years ago in Colebrook, New Hampshire, correct?

 6   A.    Correct.

 7   Q.    Now, when you told Mr. Costello that you didn't want

 8   something like what happened in Wakefield to happen in

 9   Rowley, or whatever exact words it was that you were

10   using, he told you that he felt threatened by those -- by

11   what you said?

12   A.    Not immediately.

13   Q.    When did he tell you he felt threatened?

14   A.    A couple of sentences later.  After I explained what

15   it was, for one thing.

16   Q.    And you indicated to him that he shouldn't take that

17   as a threat?

18   A.    Several times.

19   Q.    And --

20   A.    I did.  He started screaming into the phone.

21            MR. KENNEY:  I urge you to listen to the

22         question and answer only the question.

23   Q.    (By Ms. Fitzgerald)  Why would you bring up

24   shootings in Wakefield and Colebrook, New Hampshire, when
```

```
 1   you were talking to Mr. Costello about complaints that you
 2   had with the board of health?
 3              MR. KENNEY:  I'll object, but he can
 4        answer.
 5   A.   Why would I bring that up?
 6   Q.   (By Ms. Fitzgerald)  Right.
 7   A.   I brought it up solely to prevent it ever happening.
 8   And Mr. -- it was my thought, my -- it's my conclusion
 9   that the way they operate in promulgating their rules and
10   regulations, that they could be responsible for -- I'm
11   trying to think of the proper word here.  Give me a
12   dictionary or something.
13        They could be the catalyst that could be -- that
14   could cause -- be a causation for an event like that.
15   Q.   And it's your testimony that you did not mean that
16   as a threat?
17   A.   Absolutely.  Only to inform him, as it's a public
18   safety issue.
19   Q.   The shootings in Wakefield happened less than two
20   weeks before this incident on January 8, 2001, correct?
21   A.   I believe.  You have the date, right?  December.
22   Q.   And at the time that you made this statement to
23   Mr. Costello about Wakefield, you understood that some
24   people could interpret what you were saying as a threat?
```

```
 1   weren't getting anywhere with Mr. Costello, and I
 2   terminated the conversation in a polite manner.
 3   Q.   Did you go to the Rowley board of health meeting
 4   that night, January 8, 2001?
 5   A.   Yes.
 6   Q.   Did you have any items on the agenda that night?
 7   A.   No.
 8   Q.   What was your purpose for appearing at the board of
 9   health meeting that night?
10   A.   To make a complaint to Mr. Costello.
11   Q.   You had already made a complaint to him over the
12   phone, hadn't you?
13   A.   I was trying to make a complaint and inform him of a
14   public safety issue.  It possibly could be a public safety
15   issue.
16   Q.   At some point that night, you also went to the board
17   of selectmen meeting, correct?
18   A.   Correct.
19   Q.   Was the board of selectmen meeting before the board
20   of health meeting?
21   A.   They occur simultaneously.
22   Q.   But which one did you go to first?
23   A.   Board of selectmen meeting.
24   Q.   Let me go to that first then.  At some point that
```

1    night, you went to the board of selectmen meeting?

2    A.    That's correct.

3    Q.    And did you have any items on the agenda that night

4    with the board of selectmen?

5    A.    No.

6    Q.    So what was your purpose for going to the board of

7    selectmen that night?

8    A.    To make a complaint.

9    Q.    About what?

10   A.    I wished to have an executive session that involved

11   my -- me.

12   Q.    An executive session to discuss what?

13   A.    To discuss my conversation with Mr. Costello.

14   Q.    What was it about -- did you want to make a

15   complaint to the board of selectmen about Mr. Costello?

16   A.    Yes.

17   Q.    What was it --

18   A.    But mostly about me.  I wanted to tell the selectmen

19   all about the conversation.

20   Q.    What was it that you wanted them to know about the

21   conversation you had with Mr. Costello?

22   A.    That Mr. Costello was -- got the wrong impression or

23   wrong -- took a wrong -- I don't know.  I guess --

24   Q.    Got the wrong impression about the statements you

DUNN & GOUDREAU

1    made about Wakefield?

2    A.    Yes.

3    Q.    Why did you think you had to go into an executive

4    session to do that?

5    A.    Well, I don't think -- I thought that was -- would

6    be the polite thing to do to -- because he's the head of a

7    board that requires respect from townspeople and so forth.

8    And I wasn't trying to embarrass him.  I just wanted to

9    let the selectmen know what was going on, to some of them,

10   as they have a duty to that effect.  And so that's what I

11   was there for.

12   Q.    Did you tell the board of selectmen that you didn't

13   think Mr. Costello should be on the board of health?

14   A.    I believe that I may have.  I thought he should

15   recuse himself.

16   Q.    Did one of the selectmen indicate to you that he

17   believed you had threatened a town employee?

18   A.    I believe something like that.

19   Q.    He told you that he got a call from Mr. Costello,

20   that he was upset about what you had said?

21   A.    I believe.

22   Q.    And did you again -- did you make the statement to

23   the board of selectmen that you were trying to prevent

24   another Colebrook, New Hampshire or Wakefield from

1   happening?

2   A.    I may have said that.  Yeah.  I did say that.

3   Q.    And you were aware when you made that statement that

4   when you had made it previously to Mr. Costello, that he

5   felt threatened by it, correct?

6            MR. KENNEY:  Objection.

7   A.    Correct.

8            MR. KENNEY:  You can answer.

9   A.    Correct.

10  Q.    (By Ms. Fitzgerald)  Yet despite knowing that

11  Mr. Costello was threatened, you repeated the same

12  statement to the board of selectmen?

13           MR. KENNEY:  Objection.

14           You can answer.

15  A.    Naturally I would do that because that was what was

16  said and it had to be referred to.  It doesn't make sense

17  to refer to anything else.

18       The selectmen run the town, and I believe that they

19  should know what the -- the right hand needs to know what

20  the left hand's doing.

21  Q.    (By Ms. Fitzgerald)  Do you recall one of the

22  selectmen telling you that you shouldn't go around making

23  statements like that to public employees because they

24  might take it as a threat?

A.    I think that I recall him saying that.  I think he

was wrong about saying that.  I think I had an obligation

to say something like that in this case.  As a citizen, it

was shirking my duty not to bring it to their attention.

They're the officers.  They're the chiefs.

Q.    Did you believe that Mr. Costello and the board of

selectmen weren't aware that there had been a shooting in

Wakefield or Colebrook, New Hampshire?

        MR. KENNEY:  Objection.

A.    I'm not sure.  I had no idea what they knew or

didn't know.

Q.    (By Ms. Fitzgerald)  But you thought it was

important to bring it to their attention?

A.    Absolutely.

        MR. KENNEY:  Objection.  Misstates the

        testimony.

Q.    (By Ms. Fitzgerald)  So how long were you at the

board of selectmen that night?

A.    Well, I believe I waited an hour.  Sitting in the

seat, waiting an hour and waited for my turn.

        MR. KENNEY:  The question is how long you

        were there total.

A.    Maybe an hour and a half or so.

Q.    (By Ms. Fitzgerald)  And then after you left the

1  board of selectmen, you went to the board of health?

2  A.    Yes.  I did.

3  Q.    And what was the purpose for going to the board of

4  health that night?

5  A.    I went there to address face to face with

6  Mr. Costello, to tell him that I know that he knew that it

7  was never intended as any threat, that it was not a

8  threat.  And I was little upset because he was doing that,

9  so -- and I did it in a polite way, so --

10 Q.    Did you make similar comments about Wakefield and

11 Colebrook, New Hampshire to any state offices on

12 January 8, 2001?

13 A.    Yes.

14 Q.    Who else did you make that statement to?  The DEP?

15 A.    I believe I made it to the DEP, to the environmental

16 affairs head office, to the lieutenant governor's office

17 and including the FBI accidentally.  Somebody directed it

18 to the FBI office accidentally, by the way.  As far as I

19 know.

20 Q.    I'm going to show you a document that's been marked

21 Exhibit No. 1.  Tell me if you've ever seen that document.

22 A.    Yes, I have.

23 Q.    Is this the letter that you were given by the Rowley

24 Police Department on January 9, 2001, indicating that in

48

1    doing for the last number of years, by order of the police

2    department, Chief Barry, in a document that --

3    Q.    I'm going to show you another letter dated May 28,

4    2004.  It's a letter to me from Attorney Kenney with a

5    copy to you.  Tell me if you've seen that document before.

6         Have you seen the document before?

7    A.    Yes.

8    Q.    At some point, the conditions that are set forth in

9    Chief Barry's letter of January 24, 2001 that you give

10   24-hour notice and have a police escort were lifted?

11   A.    Yes, they were.

12   Q.    Do you know when that was?

13   A.    It was about the time of the auctions, when the town

14   was auctioning off land.  I'd have to check the exact

15   dates.  But it had to do with that event.  The lifting.

16   Q.    The conditions that were imposed in that letter of

17   January 9, 2001, did those prevent you from conducting

18   your business with the Town of Rowley?

19        MR. KENNEY:  Objection.

20   A.    Yes.  There was times it prevented me from doing

21   business.

22   Q.    (By Ms. Fitzgerald)  And when did it prevent you

23   from conducting your business and how?

24   A.    I'd have to go back.  I can't recall without going

DUNN & GOUDREAU

1  back to my notes, et cetera, but --

2      But I did not have access to the town meeting

3  minutes, the agendas that are posted on the bulletin

4  boards.  Just in general, just -- it was an impediment to

5  normal pursuit of business, and in particular, having to

6  do with the auction and doing due diligence and research.

7  Q.    In terms of -- what auctions are you referring to?

8  A.    The town's auctions on the lands that they auctioned

9  off.

10 Q.    You mean tax sales?

11 A.    Tax sales.

12 Q.    But without your notes, you can't recall any

13 specific instances where the conditions in that letter

14 prevented you from doing business?

15 A.    Well, I just named one.

16 Q.    And when was that tax sale?  When are those held?

17 A.    What's the date of that letter?

18     I'd have to refer to the notes.

19 Q.    Those tax sales, aren't those published in the

20 paper, in the newspaper?

21 A.    Yes, they are.

22     MR. KENNEY:  I don't want to interrupt,

23     Pam.  Is now a good time for a quick break?

24     MS. FITZGERALD:  Sure.

```
 1        mean or how does he feel that he was slandered?
 2        Those are two different questions.
 3   Q.    (By Ms. Fitzgerald)  I want to know first what he --
 4   I know he doesn't know the legal definitions, but what
 5   facts do you have upon which you base your claim that you
 6   were defamed, libeled or slandered?
 7   A.    What the facts are was that I was drummed out of a
 8   meeting, out of a public meeting, as I'm trying to make a
 9   complaint.  And shouted out by Mr. Madsen, I believe it
10   was.
11   Q.    Are there any other facts upon which you base your
12   claim that you were libeled, slandered or defamed?
13   A.    Then you sent letters stating that I had threatened
14   people when I hadn't, to everybody in the world, including
15   the newspaper, the town.  All town officials.
16   Q.    Who sent letters?
17   A.    Well, I don't know who -- I wasn't there.  I don't
18   know.  But some of them were signed by Chief Barry, and I
19   probably haven't seen them all.  The administrators or --
20   I don't know.
21        The ones I have seen, you have copies here.  And
22   they contain -- even those contain what I feel to be
23   derogative statements about me.
24   Q.    The letter that was sent to you, you're referring to
```

```
 1    the letter that was sent to you by Chief Barry?

 2    A.    Yes.  Absolutely.  That's --

 3    Q.    But that letter was sent to you, correct?  It's not

 4    addressed to anyone else?

 5    A.    It was sent to me.  Yes.  But I know other people

 6    have seen it, from what I understand.

 7    Q.    Who else has seen it?

 8    A.    Well, I believe you have, and I believe Mr. Fletcher

 9    has.  And I don't know -- I hope to find out who else has

10    seen those.

11    Q.    Was this letter published in the town newspaper or

12    in any newspaper?

13    A.    Not that -- I don't know.

14    Q.    So who else are you aware of has seen this letter

15    other than yourself, Chief Barry and counsel for the Town

16    of Rowley?

17    A.    I don't know of anybody else.

18    Q.    What other letters do you believe contain

19    information about you that was defamatory?  Other letters

20    or writings?

21    A.    When they lifted it.

22    Q.    And what was that?

23    A.    Well, I don't have the letter here, but --

24    Q.    But a letter that was sent to you?
```

```
 1   A.     Oh, I don't know who all it was sent to, but --
 2   Q.     Did you receive a letter lifting the conditions that
 3   were imposed on January 9, 2001?
 4   A.     I believe I did.
 5   Q.     And you don't know who else received that letter?
 6   A.     No.  I can't recall at this time.
 7   Q.     Do you know if that letter was ever published in any
 8   newspaper?
 9   A.     I have no idea.
10   Q.     Are there any other letters or writings that you
11   allege contain defamatory statements about you?
12   A.     I don't -- I can't recall.  I don't know.
13   Q.     And other than this letter and the letter lifting
14   the conditions and the conversations that you had with the
15   board of selectmen and the board of health, did any other
16   employees of the Town of Rowley make any statements that
17   you believe were defamatory?
18   A.     From -- yes.
19   Q.     Who made those statements?
20   A.     I believe -- I believe a Mr. Madden made a
21   statement.
22   Q.     When did he make this statement?
23   A.     I believe that you have a copy of it in the record.
24          MR. KENNEY:  The question is -- what was
```

1        I believe the board of health or somebody in the

2    town officials interfered with my getting an installer's

3    license and renewal in the city of Newburyport, possibly

4    the city of Georgetown -- town of Georgetown.

5        That's --

6    Q.    You said Mr. Ward insulted you sometime --

7    A.    Assaulted.

8    Q.    Assaulted?

9    A.    Assaulted me.

10   Q.    How did that -- tell me what happened.

11   A.    Well, it had to do, I believe, with a zoning issue,

12   with removal of my apartment, at the apartment at

13   27 Central Street -- I think at one time they said they

14   were going to come over and look at the apartment when

15   I've asked them to.

16        I asked them to -- I asked both building inspectors,

17   his predecessor.  And he was involved -- that's when they

18   changed.  I asked both of them to come over and look at

19   the 27 Central Street and see for themselves, as they're

20   required to do as part of their duties.  They're the ones

21   who have to make the determination of zoning issues and

22   whether building permits are required.  So I asked them to

23   come over and look at that.

24        And they made a date -- one of them made a date.  I

```
 1   Q.    What evidence do you have to support that claim?

 2   A.    Evidence from Mark Tolman.

 3   Q.    Who?

 4   A.    Mark Tolman.

 5   Q.    T-O-L-M-A-N?

 6   A.    T-O-L-M-A-N.   Mark Tolman.

 7   Q.    And who's he?

 8   A.    He was a director for the city of Newburyport.

 9   Q.    And what did he tell you?

10   A.    He said that people from town officials in Rowley

11   have told him that I was not suitable, someone -- that I

12   shouldn't have a license.

13   Q.    Did he say what particular officials in the Town of

14   Rowley --

15   A.    I asked him that.

16         MR. KENNEY:  Let her finish.  You're

17         talking over her.

18         Now you can go.

19   Q.    (By Ms. Fitzgerald)  Did you ask him -- did he tell

20   you what officials?

21   A.    No.  He said there was several.  Like ten.  He used

22   that word.  "Ten."  "There's ten people."

23   Q.    Did he tell you names?

24   A.    No.  I asked him.
```

DUNN & GOUDREAU

```
 1   Q.    I'm sorry.  Mr. Tolman?

 2   A.    Mark Tolman.

 3   Q.    And what is his title?

 4   A.    He was health director.  Agent.  Health agent.

 5   Q.    And when did he tell you that?

 6   A.    He told me that upon renewal the first year.

 7         MR. KENNEY:  She wants a date.

 8   A.    It would have been June or something of last year.

 9   Q.    (By Ms. Fitzgerald)  Of 2003?

10   A.    Yeah.

11   Q.    You have an installer's license in Newburyport?

12   A.    Yes, I do.

13   Q.    Where else do you have an installer's license?

14   A.    City of Haverhill.

15   Q.    Was there some delay in you getting your installer's

16   license in Newburyport?

17   A.    Yes, there was.

18   Q.    When did you apply, and when did you get it?

19   A.    Let's see.  I applied when Mr. Gallagher was the

20   agent there.

21         MR. KENNEY:  She wants your best

22         approximation of the time.

23   Q.    (By Ms. Fitzgerald)  When you applied and when you

24   received it.
```

```
1    A.    Probably applied -- let's see.

2          2002, I think.

3          I think I applied for it in 2001.

4    Q.    You applied in 2001, received it in 2002?

5    A.    Correct.  I believe that's the case.

6    Q.    You also indicate in this letter that your -- in

7    this letter marked Exhibit 7, that your civil rights have

8    been compromised by the actions of town officers and

9    representatives.  Can you tell me what civil rights you

10   believe have been compromised by the town?

11   A.    The pursuit of education and happiness, whatever you

12   want to call it.  Pursuit of life in general for 15 years.

13   Q.    You're talking about because of the condemnation?

14   A.    I'm talking about -- well, yeah.  That's part of it,

15   but -- if I may go back to the previous question --

16         MR. KENNEY:  No.  Answer the question

17         that's before you.

18   Q.    (By Ms. Fitzgerald)  Well, what I want to know is

19   you claim that your civil rights have been violated.

20         MR. KENNEY:  Answer the question that's

21         before you.

22   Q.    (By Ms. Fitzgerald)  Part of this lawsuit, right?

23   You're claiming that the town has violated your civil

24   rights, correct?  And that they've defamed you.
```

DUNN & GOUDREAU

1    So I need to know exactly what facts you base that

2  on.  What conduct by the town has violated your civil

3  rights?

4  A.    Well, they interfered.  They interfered with my

5  seeking education and obtaining licenses, including a

6  state inspector's license.

7  Q.    And how have they done that?

8  A.    When I applied for inspector's license, I was told

9  that I didn't have the qualifications and not suitable by

10  Mr. Higgins, who is the instructor or the person that you

11  apply to for the license.  He stated that he got that from

12  Mr. David Ferris.

13    And when I called Mr. Ferris and asked him about

14  that, he said, "Mr. Higgins would never say that I said

15  that."

16    And the only thing that I can think of is that he

17  must have -- you come down to presumptions and assumptions

18  here.  And the only place that I could think of that I

19  don't know is coming from the Town of Rowley.

20  Q.    The state inspector's license you're talking about,

21  is that to be a Title 5 inspector?

22  A.    Correct.

23  Q.    But you don't have any facts to base that claim that

24  anything the Town of Rowley has done -- strike that.

1    Do you have any facts on which you base your claim

2    that anyone from the Town of Rowley has interfered with

3    your application for a Title 5 inspector's license?

4    A.    At this point, I do not.

5    Q.    How else have town officials or employees violated

6    your civil rights?

7    A.    Well, I believe it's a basic civil right to repair

8    and maintain and to live in your home without

9    overburdensome and undue regulations.  And that's what's

10   happened.

11   Q.    And you're talking about property at 27 Central

12   Street?

13   A.    I'm talking about -- absolutely.

14   Q.    You don't own that property, do you?

15   A.    No.  I do not own that property.

16   Q.    How else has the town violated your civil rights?

17   A.    I can't recall.  There's so many of them.  I think

18   you have a letter that states what they are.  And I refer

19   you to that letter.

20        MR. KENNEY:  She's asking for your memory

21        as you sit here today.

22   A.    The best of my memory is --

23   Q.    (By Ms. Fitzgerald)  What you've told me today?

24   A.    Yes.  And I think I missed some, but --

```
 1
 2                    *   (Question read.)
 3
 4   A.    Yes.  I expected to live my life in a private
 5   manner.  And privacy is important to me.  And because of
 6   all these events, I have been unduly exposed.  And because
 7   of that, I believe that damage has resulted because of
 8   that.
 9         In one of the counts I referred to where one
10   possibly illegal executive session was -- I believe there
11   are many illegal executive sessions conducted by the board
12   of health.  And I also believe that some of the pleadings
13   that have taken place in the courts, both in Massachusetts
14   and Federal Court -- and to have been -- I'd say
15   inaccurate.
16         And because of that inaccuracy, because of that
17   negligence and in finding what was to be accurate or the
18   facts of the case, has been and causes me undue damages.
19   Harm.
20   Q.    (By Ms. Fitzgerald)  What are you talking about when
21   you say "an illegal executive session by the board of
22   health?"  When was that allegedly held?
23   A.    January.  I believe it was 8th.  Was one of them.
24   Q.    By the board of health or by the board of select --
```

```
 1   A.      By the board of health.

 2   Q.      And why do you think it was illegal?

 3   A.      Because the subject matter was public.

 4   Q.      The subject matter was what?

 5   A.      The subject matter should have been brought out in

 6   the public.

 7   Q.      And what was the subject matter that you believe

 8   that they were discussing that should have been in a

 9   public session?

10   A.      I believe it was -- I can't -- I'd have to check my

11   notes to the exact words, but I think it's juicy -- it had

12   to do with the events and Mr. Costello's description of

13   what was to take place at a later time.  "Should we do it

14   in public now, or should we do it in exec?"

15   Q.      What was the subject matter of the execution session

16   that you believe or what do you think was the subject

17   matter of the execution session?

18   A.      Mr. Hurlin.  And as a result -- one of the things I

19   always requested, that anytime they talk about me, that I

20   be invited, notified and that I participate.  And most of

21   the times, I would probably say, "Please do it in open

22   session."  So the breaking of Freedom of Information and

23   open meeting laws occurred at that time.

24   Q.      At the time that this incident had occurred in
```

```
1   2001 --

2   A.    That's right.

3   Q.    -- you were involved in litigation with the Town of

4   Rowley, correct?

5   A.    Mm-hmm.

6         MR. KENNEY:   Just say "yes."

7   A.    Yes.

8   Q.    (By Ms. Fitzgerald)  I just want to be clear.  You

9   have claims against the town in this complaint.  I'm just

10  talking about this complaint now for defamation and

11  violation of your civil rights, correct?  That's what this

12  complaint is.

13      And have you told me everything today which forms

14  the basis of those claims that are either contained in

15  this complaint or you've testified to today?

16  A.    I think Alyssa Rusiecki once made innuendo in a

17  meeting about me that was unfactual, incorrect and was

18  denigrating to me.

19  Q.    When was that meeting?

20  A.    I'd have to refer to my notes to tell you the exact

21  date, but I was -- it had to do with Mr. Howard Ricker

22  taking his installer's test.

23  Q.    Was that before January 8, 2001?

24  A.    I think it's in and about that time again.
```

1   A.    Probably yeah.  I talked with Nathalie Cook about

2   it.

3   Q.    What did you talk about?

4   A.    Just, you know, what I should -- make sure I don't

5   answer questions about the other cases.  Keep it to the

6   slander case.  Or something like that.  Then she

7   whispered, "Good luck," or --

8         MS. FITZGERALD:  I have no other questions.

9         MR. KENNEY:  I actually have a few

10     questions.

11

12         CROSS EXAMINATION BY MR. KENNEY:

13

14   Q.    The January 9, 2001 letter from Chief Barry to

15   you -- that's Exhibit No. 1, correct?

16   A.    Okay.  Yes.

17   Q.    Other than yourself and Mr. Barry, who do you know

18   that was aware of the policy that was issued as a result

19   of this letter, Exhibit 1?

20         MS. FITZGERALD:  Objection.

21         You can answer.

22   A.    I believe that all the town officials and the

23   newspaper.  And it seems to me like the general public got

24   to know about that.

1    Q.    (By Mr. Kenney)   Let's start with town officials.

2    How do you know that the town officials became aware of

3    the policy?

4    A.    I believe they sent around a memo to town officials,

5    all departments.

6    Q.    You mentioned the newspaper.   Was there a newspaper

7    article about the policy?

8    A.    Yes, there was.

9    Q.    In what newspaper?

10   A.    In the *Newburyport News*.

11   Q.    Do you believe that that article is defamatory to

12   you?

13   A.    I believe it certainly puts me in a bad light and --

14   yes.

15   Q.    And you mentioned that the general public was aware

16   of the policy as well, correct?

17   A.    Correct.

18   Q.    Is that because of the newspaper article?

19   A.    Well, I believe that -- I believe so.

20   Q.    On January 8, 2001, that evening, you attended the

21   Rowley board of selectmen meeting, correct?

22   A.    What date?

23   Q.    On January 8, 2001 --

24   A.    Yes.  Yes, I did.

1   Q.    -- correct?

2         Was there anything said at that meeting that you

3   believe was defamatory to you?

4   A.    Yes.

5   Q.    What was said?

6   A.    "You can't go around acting like a terrorist" -- I'm

7   sorry.  Something similar to that.

8   Q.    Who said that?

9   A.    I believe Mr. Madden shouted it at me.  I believe

10  Mr. Merry said something to that effect, too.  That no

11  sane person who would say something like what I had --

12  what I was saying in my complaint.

13  Q.    He said that during the selectmen meeting?

14  A.    Well, he said it to the meeting and then -- he said

15  it to the meeting.  And Mr. Jack DiMento said it to me

16  again a short time ago.  In the last three or four months,

17  six months, he said that to me.

18  Q.    How about at the board of health meeting, that

19  evening?  Was there anything said that you believe to be

20  defamatory of you?

21  A.    When I went back to them, I believe the tape will

22  show that there's defamatory --

23  Q.    Do you recall any statements at the board of health

24  meeting January 8, 2001 that you believe were defamatory

1  to you?

2  A.    Yeah.   When they referred to juicy -- I think it was

3  juicy events of some kind.   But it's something similar to

4  that.   But about Hurlin.

5  Q.    Who said that?

6  A.    Mr. Costello.

7  Q.    And that was during the meeting?

8  A.    During the meeting.

9  Q.    Do you believe the policy that's reflected in this

10  Exhibit 1 was in violation of your rights under the First

11  Amendment?

12  A.    Absolutely.

13  Q.    Why?

14  A.    I think that everybody -- and more particularly

15  this -- that these people are officials, and they're

16  representatives of the public.

17       What makes it so egregious to me is that being the

18  dutiful citizen, has an obligation to bring it to the

19  attention, public safety.   That's what I attempted to do

20  and was denigrated and -- because of this.   Because of my

21  wanting to, in a polite, in a low key, in a private way,

22  to bring to the attention that -- that the way that

23  they're promulgating could be a catalyst toward something

24  that none of us would want in the future to happen in our