UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10833MBB

NICHOLAS HURLIN,   )
   Plaintiff         )
                  )
v.                 )
                  )
TOWN OF ROWLEY,    )
   Defendant         )

## PLAINTIFF'S MEMORANDUM OF FACT IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Nicholas E. Hurlin (hereinafter, the "Plaintiff") submits this Memorandum of Fact in support of its opposition to the Town of Rowley's (hereinafter, the "Defendant") Motion for Summary Judgment. Genuine issues of material fact exist, such that the Plaintiff is entitled to a trial on the merits and the Defendant is not entitled to summary judgment.

For purposes of this opposition to the Defendant's Motion for Summary Judgment only, the Plaintiff states the following facts:

1. This claim arises out of the Defendant's mischaracterization and publication of statements made by the Plaintiff to the Defendant's Board of Health Chairman, Mr. Charles Costello, and to the Defendant's Board of Selectman on January 8, 2001, as well as the Defendant's subsequent retaliatory actions. **(See Plaintiff's Amended Complaint).**

1

2. The Plaintiff owned the property located at 27 Central Street, Rowley, Massachusetts (hereinafter, "the property") from 1987 until 1995, when he sold the property to Nathalie Cook.

3. Nathalie Cook, present owner of the property, employs the Plaintiff as her manager and agent for the property.

4. Two prior lawsuits occurred between the Plaintiff and the Defendant regarding the property. **(See Exhibit 1).**

5. The first suit, initiated by the Defendant, sought an injunction preventing the Plaintiff from utilizing the property as a two-family residence, although the house historically was used as a two family residence. The injunction was granted in favor of the Defendant, without a hearing. **(See Exhibit 1).** The parties are currently in the process of trying to arrive at a mutually acceptable solution, and the plaintiff has requested a mixed residential/commercial use of the property. **(See Exhibit 2).**

6. The second suit, initiated by the Plaintiff, arose after the Defendant improperly condemned the property. Judge Whitehead of the Lawrence Superior Court found in a March of 2001 decision that the condemnation of the property due to alleged problems with its septic system was illegal, due to failure of the Board of Health to follow proper procedures and regulations. The property in fact was in compliance at the time of the illegal condemnation, and the condemnation was lifted. **(See Exhibit 3).**

7. At the time of the January 8, 2001 incident, which is the subject matter of this claim, the second suit (illegal condemnation) was still on-going. **(See Exhibit 3).**

8. On January 8, 2001, the Plaintiff went in person to the Rowley Board of Health in order to inquire about Title Five Inspections of the property and related tests. **(See Exhibit 4, p. 12).**

9. The Plaintiff was refused an answer to his questions, as had been the case many times in the past when he sought information regarding Title 5 Inspection and testing of the property. **(See Exhibit 4, p. 18-20).**

10. The Plaintiff then went to the Defendant's Selectman's Administrative Office to request assistance with the Defendant's Board of Health. The Plaintiff was assured that Charles Costello, the chairman of the Defendant's Board of Health, would call the Plaintiff to discuss the matter. **(See Exhibit 4, p. 15-16).**

11. The Plaintiff then returned to his residence and called various other agencies seeking answers for his questions regarding Title Five inspection and testing issues, and seeking to voice his concerns about the failure of the Defendant Board of Health to follow proper procedures and regulations. The Plaintiff contacted the Massachusetts Department of Environmental Protection, the Department of Environmental Affairs, and was eventually transferred to a department of the Federal Bureau of Investigation. **(See Exhibit 4, p. 37).**

12. The Plaintiff voiced his concerns to all of the departments/agencies he contacted and he mentioned two prior unfortunate incidents, which occurred in Wakefield, Massachusetts and Colebrook, New Hampshire, and resulted in violence, as examples of the tragic results of abuse of power. No one perceived his tone or speech in a threatening manner. **(See Exhibit 4, p. 37).**

13. Mr. Costello telephoned the Plaintiff at his residence on January 8, 2001. The Plaintiff expressed his concerns and frustrations to Mr. Costello and informed Mr. Costello that the Plaintiff's due process rights were being violated by the Defendant's failure to follow proper procedure and regulations, as well as the Defendant's failure to cooperate with the Plaintiff in obtaining information regarding Title Five inspection of the property. **(See Exhibit 4, p. 22-27).**

14. During his telephone conversation with Mr. Costello, the Plaintiff voiced his concerns that the Defendant Board of Health systematically and repeatedly hindered and obstructed people from making proper repairs to their property, generating animosity and frustration. The Plaintiff requested an audit or examination of the procedures and operations of the Defendant Board of Health in order to avoid unnecessary conflict. **(See Exhibit 4, p. 22-27).**

15. During the same telephone conversation, the Plaintiff mentioned the tragedies that had occurred in Wakefield, Massachusetts and Colebrook, New Hampshire, referring to the incidents as "tragic events." The Plaintiff never referred to the events as "shootings," as the Defendant's statement of fact states. The Plaintiff informed Mr. Costello that he did not mention those incidents in order to threaten anyone, but to heighten awareness and request an examination of the operating procedures and policies of the Defendant Board of Health. **(See Exhibit 4, p. 27).**

16. The Plaintiff is a non-violent person and did not mention the incidents in Wakefield in Colebrook in order to threaten anyone, but to raise awareness regarding the level of frustration created by the Defendant's failure to follow the law. **(See Exhibit 4, p. 27).**

17. Nathalie Cook was present with the Plaintiff during the entirety of the telephone conversation between the Plaintiff and Mr. Costello. Nathalie Cook believes that the Plaintiff was properly addressing his concerns to Mr. Costello regarding the procedural problems going on with the Defendant Board of Health, and she believes that the Plaintiff did not threaten Mr. Costello. **(See exhibit 5).**

18. In concluding their telephone conversation, the Plaintiff and Mr. Costello arranged a meeting for January 22, 2001 to discuss the matter further.

19. Mr. Costello allegedly felt threatened by the Plaintiff's behavior, so Mr. Costello contacted Selectman Chair A.J. Paglia, who then called the Rowley Police Department. The Rowley Police Department interviewed Mr. Costello regarding the events of January 8, 2001 and created a report of the incident. The report does not reflect the fact that the Plaintiff repeatedly told Mr. Costello that his comments were not intended as a threat. **(See Exhibit 6)**.

20. On the evening of January 8, 2001 the Plaintiff attended the Defendant's Board of Selectman meeting and requested that the Board of Selectman hold an executive session to discuss the on-going problems between the Plaintiff and the Defendant, but the Board of Selectman refused to hold an executive session. **(See Exhibit 4, p. 33-34)**.

21. One of the Defendant's selectman informed the Plaintiff that Mr. Costello had interpreted their earlier phone conversation in a threatening manner. **(See Exhibit 4, p. 34)**.

22. The Plaintiff assured the Board of Selectman that he had not intended to threaten anyone. **(See Exhibit 4, p. 34-36).**

23. In attempting to explain the nature of his earlier telephone conversation with Mr. Costello, the Plaintiff repeated his concerns about the operating procedures of the Board of Health and explained his prior comments to Mr. Costello regarding the tragedies in Wakefield, Massachusetts and Colebrook, New Hampshire. The Plaintiff explained that his intentions were to raise awareness and avoid similar future tragedies. **(See Exhibit 4, p. 33).**

24. One of the Defendant's selectman told the Plaintiff that comments regarding the tragedies in Wakefield and Colebrook could be taken as a threat by town employees/officials and informed the Plaintiff that he should not make such comments. The Plaintiff never referred to the events as "shootings", but instead referred to them as "tragedies" in order to prevent his intent from being misconstrued.

25. After the Plaintiff left the Board of Selectman's meeting, the Board of Selectman called an executive session to discuss the Plaintiff. **(See Exhibit 7).**

26. After the Plaintiff left the Board of Selectman's meeting, he went to a meeting at the Board of Health in order to further explain his comments to Mr. Costello and assure the Board of Health that he did not intend to threaten anyone. **(See Exhibit 4, p. 37).**

27. Likewise, the Plaintiff contacted the Rowley Police Department on the evening of January 8, 2001 with the intention of reporting the incident that had occurred at the Defendant Board of Selectman's meeting. The Rowley Police Department refused to come to the Plaintiff's residence and take his statement or to perform an investigation until the Plaintiff informed the Rowley Police Department that he

6

would alternatively call the Massachusetts State Police. The Defendant Police arrived and took a brief report from the Plaintiff, which the Plaintiff contends is inadequate and incomplete. **(See Exhibit 8).**

28. On January 9, 2001, the Rowley Police Department Chief, Mr. Kevin Barry, sent the Plaintiff a letter advising that as a result of the events of January 8, 2001 the Plaintiff was restricted from entering the Town Hall or the Town Hall annex, except by appointment with 24 hours advance notice and a Rowley Police Department escort. **(See Exhibit 9).**

29. On January 9, 2001, a memorandum was sent from the then-presiding Chairman of the Rowley Board of Selectman, Mr. G. Robert Merry, to all department heads, employees, boards, and commissions, informing the recipients that the Plaintiff is not to enter Town Hall or Town Hall Annex without twenty-four hour advance notice and a police escort. The recipients were requested to call the police immediately if the Plaintiff entered the Town Hall or Town Hall Annex without such an appointment and a police escort. **(See Exhibit 10).**

30. On January 24, 2001, the Plaintiff sent a letter to Police Chief Barry in response to his January 9, 2001 letter, requesting that Chief Barry reconsider his position and explaining the motivation and intent behind the Plaintiff's actions and statements. **(See Exhibit 11).**

31. On August 18, 2003, the Chairman of the Board of Selectman, Mr. A.J. Paglia, rescinded the conditions set forth by Police Chief Barry in his January 9, 2001 letter. **(See Exhibit 12).**

32. Three articles regarding the incidents of January 8, 2001 were published in the Newburyport newspaper, The Daily News. **(See Exhibit 13, 14, & 15).**

33. In a January 9, 2001 article in The Daily News, Selectman Robert Madden was quoted as saying "no sane person would say that", in reference to the Plaintiff's comments about the incidents in Wakefield, Massachusetts and Colebrook, New Hampshire. **(See Exhibit 13).**

34. In a January 10, 2001 article in The Daily News, Police Chief Kevin Barry was directly quoted as stating "when he [the Plaintiff] wants to visit Town Hall there are certain conditions he must conform to." **(See Exhibit 14).**

35. In the same January 10, 2001 article, Selectman Robert Madden was quoted saying "we, as town officials, cannot allow an individual [the Plaintiff] to terrorize town employees . . . it just can't be allowed to happen." **(See Exhibit 15).**

36. In a January 11, 2001 article in The Daily News, the author of the article, Jesson Ingraham, stated that the details of the arrangement [regarding the Plaintiff] were given to The Daily News by a town employee. **(See Exhibit 15).**

37. Mark Tolman, the Health Agent for the City of Newburyport, later told the Plaintiff that multiple Defendant town officials told Mr. Tolman that the Plaintiff should not be granted an installer's license in the City of Newburyport because he was not a suitable person. **(See Exhibit 4, p. 66-67).**

38. In the past, the Plaintiff has requested cooperation from the Defendant in obtaining access to and copies of public police records regarding the property located at 27 Central Street. The Defendant Police Department informed the

Plaintiff that he would have to pay $317.28 before they would initiate a search of the records to provide the Plaintiff with the requested information. **(See exhibit 16).**

                                            Respectfully Submitted,
                                            The Plaintiff,
                                            Pro Se

                                            Nicholas E. Hurlin
                                            PO Box 11
                                            Newburyport, MA 01950

Dated: March 7, 2005