1    this all one, kind of like one case.

2        I'm sure we have separate file folders like you have

3    there.

4    Q.    Did you raise your voice to Wendy or anyone else at

5    the board of health that day?

6    A.    I don't believe I raised my voice.

7    Q.    Were you asked to leave the office?

8    A.    I think somebody said -- after I had started to

9    leave the office, somebody said, "Please leave the

10   office," and I was on my way out the door at the time.

11   But I don't believe it was Wendy that said that.

12   Q.    Do you know who it was that asked you to leave?

13   A.    I think it was the agent Alyssa Rusiecki.

14   Q.    Did you have any conversations with Alyssa Rusiecki

15   that day, January 8, 2001?

16   A.    I might have turned around and said, "Oh, there you

17   are," or something to that effect.  "You're the person

18   that has the knowledge I need.  I'd like to ask, would you

19   reply and help me get some answers to Title 5 questions?"

20   And I think she rebuffed me.

21   Q.    Had you, prior to January 8, 2001, had conversations

22   with Alyssa Rusiecki with regard to the property at

23   27 Central Street?

24   A.    I have tried to have conversations with her many,

```
 1             individual questions she asks.

 2    A.     Okay.   Yes.   I got a call from him.

 3    Q.     (By Ms. Fitzgerald)   And about what time did you get

 4    that phone call?

 5    A.     I think it's somewhere 4, 4:30, quarter to 5.

 6    Q.     Did he call you, or did you call him?

 7    A.     He called me at my request.

 8    Q.     And between the time you left the board of health

 9    office in the morning and the time you received the phone

10    call from Charlie Costello that afternoon -- and again,

11    I'm talking about January 8, 2001 -- did you have

12    conversations with anyone else from the Town of Rowley

13    during the day?

14    A.     Yes, I did.

15    Q.     Who did you speak with?

16    A.     I went directly to the selectmen's office.

17    Q.     After leaving the board of health, you went to the

18    selectmen's office?

19    A.     Selectmen's office.

20    Q.     And what did you go to the selectmen's office for?

21    A.     To make a complaint.

22    Q.     And what time was that?

23    A.     Maybe it was 9:00.

24    Q.     And who were you complaining about?
```

DUNN & GOUDREAU

1    A.    I was complaining about the board of health and not

2    receiving and not being -- being refused service that I

3    needed in order to make repairs and make a design for

4    27 Central Street.

5    Q.    And did you speak with somebody at the board of

6    selectmen's office?

7    A.    Yes.  I did.

8    Q.    And who did you speak with?

9    A.    I'm not quite sure.  I don't remember the name.  I

10    believe I asked for the administrator or --

11    Q.    Did you actually speak with the town administrator

12    that day?

13    A.    I spoke with somebody.

14    Q.    Was it a man or woman?

15    A.    It was a woman.

16    Q.    And you don't know what her name was?

17    A.    I probably have it written -- I'm sure I have it in

18    my notes now.  I just can't recall.  They have a number of

19    people there, and it's hard to keep track of the different

20    ones.

21    Q.    You know who the town administrator is for the Town

22    of Rowley?

23    A.    I do now.

24    Q.    Was that the person you spoke with on January 8,

1  A.    What type of direction?  Well, specific direction to

2  do a 15.303, 15.304.  That's maximum feasible compliance.

3  Q.    But --

4  A.    And to -- one event, to comment or give me

5  directions regarding the repairs.  What's authorized,

6  what's not.  What's considered a repair, what's not.

7         And I was hoping maybe to show her that the repairs

8  had been done so as to clarify disputes and so forth, and

9  then so I could have the proper direction to complete a

10 design.

11 Q.    And when you went to the board of health on

12 January 8, 2001 and spoke either with Wendy or whoever it

13 was that you were speaking with, what information did they

14 give you?

15 A.    None.

16 Q.    And what did they say?  Did you ask specifically

17 that "I'm looking for information with regard to these two

18 sections"?

19 A.    Yes.  Exactly.

20 Q.    And then -- and what was the response that you

21 received?

22 A.    I don't -- my response -- or their response was

23 usually -- well, I believe it was that Wendy's -- I guess

24 she did not have the expertise in Title 5.

DUNN & GOUDREAU

1  Q.    Wendy informed you that she didn't have the

2  expertise --

3  A.    Well, she's told me that a number of times.

4          MR. KENNEY:  Let her finish.

5  A.    I'm sorry.

6  Q.    (By Ms. Fitzgerald)  Wendy told you she didn't have

7  the expertise in Title 5?

8  A.    Regarding what I was asking, yes.

9  Q.    And so what is the basis for your statement that

10 they weren't being cooperative?  What else was it that

11 they did or failed to do that caused you to make the

12 complaint to the board of selectmen?

13 A.    Because I continuously asked for a heart-to-heart

14 with the agent or anybody with authority.

15 Q.    A heart-to-heart about what?

16 A.    Title 5.  And giving direction for Title 5 --

17 Q.    And it's your --

18 A.    -- to resolve the problems at 27 Central Street.

19 Q.    And it's your position that the board of health was

20 refusing or the people in the board of health office were

21 refusing to provide you with that assistance?

22 A.    Exactly.  That's correct.

23 Q.    When you went to the board of selectmen that day

24 after leaving the board of health and you made a

DUNN & GOUDREAU

1    complaint, how long were you there?

2    A.    I'm not quite sure.  It might have been 15 minutes.

3    Twenty minutes, maximum.  Fifteen, twenty.  Half an hour

4    maybe.  I'm not quite sure.

5    Q.    Other than speaking with this woman whose name you

6    don't recall or know, did you speak with anyone else at

7    the board of selectmen that day during the day?

8    A.    Possibly.  I go down there -- I've been down there

9    so many times, it's -- without my notes -- sometimes you

10   have to differentiate between one visit and the other.

11   Q.    The notes that you have with regard to your dealings

12   with the board of health and the board of selectmen, are

13   they in chronological order?

14   A.    As good as I can do it.

15   Q.    Is it similar to like a diary so it would say, for

16   instance, "January 8, 2001" --

17   A.    No.

18   Q.    -- "at 9:00, went to board of health, refused

19   information," or something like that or --

20   A.    No.

21   Q.    How is it set up?  How are your notes kept?

22   A.    I would write notes down.

23   Q.    Are they just on single pieces of paper or --

24   A.    Yeah.  Single.  Sometimes on legal pads and

1    conversation at the board of selectmen's office, you then

2    left the board of selectmen's office?

3    A.    Yes, I did.

4    Q.    And did you go to any other town office in the Town

5    of Rowley that day before you actually spoke with

6    Mr. Costello?

7    A.    I don't recall at this time.   I may have.   I don't

8    recall at this time.

9    Q.    At some point on January 8, 2001, you did receive a

10   phone call from Charlie Costello, correct?

11   A.    Yes, I did.

12   Q.    And where were you when you received that phone

13   call?

14   A.    I was in the kitchen at 441 Central Street.

15   Q.    Was anyone else present when you received that phone

16   call?

17   A.    Nathalie Cook was present.

18   Q.    At 441 Central, that's your home?

19   A.    Yes.

20   Q.    About what time did Mr. Costello call you?

21   A.    I believe -- I think it was somewhere between 4 and

22   5.   4:30.

23   Q.    And just so I'm clear, between the time you left the

24   board of selectmen's office in the morning at the time you

1  made the complaint and the time you received the call from

2  Mr. Costello, you hadn't had any conversations, at least

3  that you recall today, with anyone else at the Town of

4  Rowley about your complaint that you weren't getting

5  service from the board of health office?

6  A.    I can't recall without going and looking at my

7  notes, but I may have.  I may have.

8  Q.    Who else would you have made that complaint to?

9            MR. KENNEY:  Objection.

10           You can answer.

11 Q.    (By Ms. Fitzgerald)  At the Town of Rowley?

12 A.    Anybody that would listen.

13 Q.    Specifically, other than going to the board of

14 selectmen?

15 A.    I'd have to look back at my notes to see -- I talked

16 to many agencies that day.  State agencies.

17 Q.    Did you speak with DEP?

18 A.    I believe I did.

19 Q.    Do you know who you spoke with at DEP?

20 A.    The fellow that answers the hotline, I'm sure.

21 Q.    And did you speak to someone at DEP to make a

22 complaint about the Rowley board of health office?

23 A.    I think it became, at that particular point, a

24 general complaint of the whole -- I'm sure it included

DUNN & GOUDREAU

1    that I was not receiving services of the board of health

2    in resolving the problem at 27 Central Street.

3    Q.    When Mr. Costello called, did he tell you the

4    purpose for his call?

5    A.    Yes, he did.

6    Q.    What did he say?

7    A.    He said the town selectmen's office had called him.

8    And he said, "I've been trying to get hold of you. I

9    called several times." He said he called several times

10   that day.

11   Q.    And then what did he say to you?

12   A.    "How can I help you?" Something like that.

13   Q.    And what did you say to him?

14   A,    Well, I said that I think that we could -- I'm

15   trying to recall, but I'd have to go back to my notes to

16   see what I did say exactly, but I think I probably went

17   over the scene at 27 Central Street and asked him for help

18   in that.

19       And I think I probably asked him what he thought of

20   the hydrologist tests that they had requested that we do.

21   And he gave me -- I don't believe he would answer that

22   question to my satisfaction or any -- I think he started

23   backpedaling on the hydrologist's test that he'd asked for

24   or the board had asked for. And I think they --

1    What was the question again?  How much do you want

2  me to tell you?

3  Q.    What I want to know basically is what you said to

4  him and what he said to you, what you recall about the

5  conversations.

6  A.    Well, I asked him to give us assistance in getting

7  the situation resolved.  And I believe I started to tell

8  him, too, that I was thinking that -- I was hoping that he

9  would change his procedures and work with us, work with

10  people in general.  And I think I mentioned to him that

11  they -- I was hoping that they would look at the way they

12  operate in promulgating their laws and rules and

13  regulations.

14      And I think I told him it's a possibility with

15  today's world that it could be a safety issue.  The fact

16  that they hinder people from resolving their problems,

17  actually obstruct them from resolving the problems, could

18  be a safety issue and so forth.  And I think I mentioned

19  Colebrook and Wakefield.

20      I think he wanted to know what I meant -- what they

21  were -- I couldn't even remember whether it was Woburn or

22  Wakefield to begin with or what town.

23      So he asked me about, "What do you mean by

24  'Wakefield'?"

1    And then I think I may have said something to the
2  fact, well, it's -- when he asked me to explain that, that
3  I'm not -- I think I said to him something about "I don't
4  want you to take this in any threatening way or anything
5  like that."
6    And I'm probably using this kind of a voice as I'm
7  saying to him that, but it was -- when we had this
8  Colebrook and Wakefield event which involved the disaster
9  that happened, whatever it was, that -- I don't know if
10  you remember that yourself.
11    And the reason that I mentioned that and the reason
12  why this matter came to my mind is because Nathalie Cook's
13  daughter worked with and was killed by this fellow in
14  Wakefield or that incident only three weeks before.  And
15  we had talked about that in our family, amongst the
16  families, two or three or four times.
17    And then it occurred to me that the situation that I
18  was involved with with the Town of Rowley, it's a
19  possibility that a situation could occur like that in the
20  Town of Rowley.
21    So I had this -- I felt a need to -- to relate this
22  to the administrator, the one that's responsible for
23  administrating the health laws.  And he was the only
24  person and selectmen would be the only person that would

1   be the appropriate persons to address that issue.

2       So we had that conversation, and he started saying

3   that was -- "Well, I'm taking that as a threat."

4       And I think I -- in the same voice that we're

5   having, I said, "Listen, you shouldn't be taking that as a

6   threat because it's not a threat.  I'm talking to you.

7   You're -- as a -- you're the boss here.  It's something

8   you need to look at."  And still does, by the way, need to

9   look at that.

10      "You need to look at it now because the way you're

11  operating, the way the board of health is operating, you

12  are -- if you picked on the wrong person the way they

13  picked on me, who knows whose triggers -- who knows when

14  something would trigger something like that that would

15  happen in those towns.  It was a terrible event, and we

16  certainly don't want it to happen here in Rowley or any

17  other town."

18  Q.   Did you say that Ms. Cook's daughter was in --

19  A.   Had worked with one of the workers that was killed.

20  Q.   Was she present when the shooting occurred in

21  Wakefield, Ms. Cook's daughter?

22  A.   I don't believe so.  No.

23  Q.   Do you recall stating something to Charlie Costello,

24  the fact that you don't want what happened in Wakefield to

DUNN & GOUDREAU

1    night, you went to the board of selectmen meeting?

2    A.    That's correct.

3    Q.    And did you have any items on the agenda that night

4    with the board of selectmen?

5    A.    No.

6    Q.    So what was your purpose for going to the board of

7    selectmen that night?

8    A.    To make a complaint.

9    Q.    About what?

10   A.    I wished to have an executive session that involved

11   my -- me.

12   Q.    An executive session to discuss what?

13   A.    To discuss my conversation with Mr. Costello.

14   Q.    What was it about -- did you want to make a

15   complaint to the board of selectmen about Mr. Costello?

16   A.    Yes.

17   Q.    What was it --

18   A.    But mostly about me.  I wanted to tell the selectmen

19   all about the conversation.

20   Q.    What was it that you wanted them to know about the

21   conversation you had with Mr. Costello?

22   A.    That Mr. Costello was -- got the wrong impression or

23   wrong -- took a wrong -- I don't know.  I guess --

24   Q.    Got the wrong impression about the statements you

DUNN & GOUDREAU

1  made about Wakefield?

2  A.    Yes.

3  Q.    Why did you think you had to go into an executive

4  session to do that?

5  A.    Well, I don't think -- I thought that was -- would

6  be the polite thing to do to -- because he's the head of a

7  board that requires respect from townspeople and so forth.

8  And I wasn't trying to embarrass him.  I just wanted to

9  let the selectmen know what was going on, to some of them,

10 as they have a duty to that effect.  And so that's what I

11 was there for.

12 Q.    Did you tell the board of selectmen that you didn't

13 think Mr. Costello should be on the board of health?

14 A.    I believe that I may have.  I thought he should

15 recuse himself.

16 Q.    Did one of the selectmen indicate to you that he

17 believed you had threatened a town employee?

18 A.    I believe something like that.

19 Q.    He told you that he got a call from Mr. Costello,

20 that he was upset about what you had said?

21 A.    I believe.

22 Q.    And did you again -- did you make the statement to

23 the board of selectmen that you were trying to prevent

24 another Colebrook, New Hampshire or Wakefield from

1  happening?

2  A.    I may have said that.  Yeah.  I did say that.

3  Q.    And you were aware when you made that statement that

4  when you had made it previously to Mr. Costello, that he

5  felt threatened by it, correct?

6         MR. KENNEY:  Objection.

7  A.    Correct.

8         MR. KENNEY:  You can answer.

9  A.    Correct.

10  Q.    (By Ms. Fitzgerald)  Yet despite knowing that

11  Mr. Costello was threatened, you repeated the same

12  statement to the board of selectmen?

13         MR. KENNEY:  Objection.

14         You can answer.

15  A.    Naturally I would do that because that was what was

16  said and it had to be referred to.  It doesn't make sense

17  to refer to anything else.

18         The selectmen run the town, and I believe that they

19  should know what the -- the right hand needs to know what

20  the left hand's doing.

21  Q.    (By Ms. Fitzgerald)  Do you recall one of the

22  selectmen telling you that you shouldn't go around making

23  statements like that to public employees because they

24  might take it as a threat?

1    A.    I think that I recall him saying that.  I think he

2    was wrong about saying that.  I think I had an obligation

3    to say something like that in this case.  As a citizen, it

4    was shirking my duty not to bring it to their attention.

5    They're the officers.  They're the chiefs.

6    Q.    Did you believe that Mr. Costello and the board of

7    selectmen weren't aware that there had been a shooting in

8    Wakefield or Colebrook, New Hampshire?

9            MR. KENNEY:  Objection.

10   A.    I'm not sure.  I had no idea what they knew or

11   didn't know.

12   Q.    (By Ms. Fitzgerald)  But you thought it was

13   important to bring it to their attention?

14   A.    Absolutely.

15           MR. KENNEY:  Objection.  Misstates the

16           testimony.

17   Q.    (By Ms. Fitzgerald)  So how long were you at the

18   board of selectmen that night?

19   A.    Well, I believe I waited an hour.  Sitting in the

20   seat, waiting an hour and waited for my turn.

21           MR. KENNEY:  The question is how long you

22           were there total.

23   A.    Maybe an hour and a half or so.

24   Q.    (By Ms. Fitzgerald)  And then after you left the

1   board of selectmen, you went to the board of health?

2   A.    Yes.  I did.

3   Q.    And what was the purpose for going to the board of

4   health that night?

5   A.    I went there to address face to face with

6   Mr. Costello, to tell him that I know that he knew that it

7   was never intended as any threat, that it was not a

8   threat.  And I was little upset because he was doing that,

9   so -- and I did it in a polite way, so --

10  Q.    Did you make similar comments about Wakefield and

11  Colebrook, New Hampshire to any state offices on

12  January 8, 2001?

13  A.    Yes.

14  Q.    Who else did you make that statement to?  The DEP?

15  A.    I believe I made it to the DEP, to the environmental

16  affairs head office, to the lieutenant governor's office

17  and including the FBI accidentally.  Somebody directed it

18  to the FBI office accidentally, by the way.  As far as I

19  know.

20  Q.    I'm going to show you a document that's been marked

21  Exhibit No. 1.  Tell me if you've ever seen that document.

22  A.    Yes, I have.

23  Q.    Is this the letter that you were given by the Rowley

24  Police Department on January 9, 2001, indicating that in

1   Q.    What evidence do you have to support that claim?

2   A.    Evidence from Mark Tolman.

3   Q.    Who?

4   A.    Mark Tolman.

5   Q.    T-O-L-M-A-N?

6   A.    T-O-L-M-A-N.  Mark Tolman.

7   Q.    And who's he?

8   A.    He was a director for the city of Newburyport.

9   Q.    And what did he tell you?

10  A.    He said that people from town officials in Rowley

11  have told him that I was not suitable, someone -- that I

12  shouldn't have a license.

13  Q.    Did he say what particular officials in the Town of

14  Rowley --

15  A.    I asked him that.

16        MR. KENNEY:  Let her finish.  You're

17        talking over her.

18        Now you can go.

19  Q.    (By Ms. Fitzgerald)  Did you ask him -- did he tell

20  you what officials?

21  A.    No.  He said there was several.  Like ten.  He used

22  that word.  "Ten."  "There's ten people."

23  Q.    Did he tell you names?

24  A.    No.  I asked him.

DUNN & GOUDREAU

1   Q.   I'm sorry.  Mr. Tolman?

2   A.   Mark Tolman.

3   Q.   And what is his title?

4   A.   He was health director.  Agent.  Health agent.

5   Q.   And when did he tell you that?

6   A.   He told me that upon renewal the first year.

7        MR. KENNEY:  She wants a date.

8   A.   It would have been June or something of last year.

9   Q.   (By Ms. Fitzgerald)  Of 2003?

10  A.   Yeah.

11  Q.   You have an installer's license in Newburyport?

12  A.   Yes, I do.

13  Q.   Where else do you have an installer's license?

14  A.   City of Haverhill.

15  Q.   Was there some delay in you getting your installer's

16  license in Newburyport?

17  A.   Yes, there was.

18  Q.   When did you apply, and when did you get it?

19  A.   Let's see.  I applied when Mr. Gallagher was the

20  agent there.

21       MR. KENNEY:  She wants your best

22       approximation of the time.

23  Q.   (By Ms. Fitzgerald)  When you applied and when you

24  received it.

DUNN & GOUDREAU

AFFIDAVIT

ROWLEY, MASSACHUSETTS

TO WHOM IT MAY CONCERN

I Nathalie Cook, was present on Monday, January 8, 2001 at approximately 5:00 PM when Mr. Charli Costello of the Rowley Board of Health returned Nick Hurlin's phone call. Mr. Hurlin thanked Mr Costello for returning his call. Mr. Hurlin explained that he had called him several times over the p∙∙ year and had not had any response back. Then Hurlin said to him that the Board of Health on two occasions had told us to use a hydrologist which we did. Mr. Hurlin asked what were his thoughts ∙∙∙∙ the results that had been submitted. Mr. Hurlin said you can't always do just what Ferris and Made∙∙ Morris say they have not acted properly. Mr. Hurlin stated that he was pleased that the results w∙∙ ∙∙∙∙ what he expected. Hurlin asked Mr. Costello if he worked for the DEP, twice he had to ask him. Hul said it would be hard to take an opposite stance from the DEP. Who stands up for the citizens of Rowl∙ Mr. Hurlin said it hasn't been lived in since 1991. Mr. Hurlin said that was not acceptable seeing h∙∙ long this had been going on. If this was your Mothers home this would have been completed. Mr. Hu∙∙ said it should be completed soon. You cannot keep operating this way and we must look at the rules ∙∙∙ regulations and how there applied with introspection and keeping in mind fairness and affect upon ∙∙∙∙ and now I don't want you to misinterpret and this is not a threat so don't take it that way but if h∙ w∙∙ someone who didn't use the law and what happened to him in this case happened to them this could be another Col ∙∙EE and Mr. Hurlin asked me for the town, then he added Woburn or Wakefield. ∙∙∙∙ at th∙ moment. Mr. Costello started yelling "that's a threat, that's a threat, threat, 4 times Mr. Hurlin reiterat∙∙ to Mr. Costello he said 4 times that it was not a threat just that it shouldn't take years to get a septic repaired and it did. Was someone else it was possible that it would have turned into a Wakefield or a problem. Mr. Hurlin told Costello that he had told several State & Federal agencies earlier today pre∙∙ much the same complaints and discussions and agendas rules and regulations and there effect on society with a Hurlin and a Wakefield & Colt∙ ∙∙∙ stated it was unreasonable to wait 12 year to fix your toile∙

I asked to speak to Mr. Costello because Mr. Costello is always saying Mr. Hurlin has a history of being argumentative and unacceptable. I told Mr. Costello that I had Nathalie Cook, who wouldn't be argumentative if you had been having a problem for years and the problem was resolved. That is all I have to ∙∙∙ ∙∙∙ ∙∙∙ the phone then Mr. Costello said he would put it on the Agenda for th∙ 1/22/01 BOH meeting. Mr. Hurlin stated to Mr. Costello we should terminate this conversation and there was nothing if this conversation intended to be or was a threat. Good bye ∙∙∙∙

Mr. Hurlin is my agent and is to work with me to help me get this septic system approved. This was an agreement I made with Mr. Hurlin when I purchased 27 Central Street ∙∙∙ ∙∙∙∙

I would like you to know that Mr. Hurlin had been discussing policy and regulations and the affects th∙ have on our society and what influence pertain to Wakefield and the others. My daughter and her husband had been co workers of one of the victims of Wakefield. ∙∙∙∙

Signed under the pains and penalty of perjury on the _13th_ of _January_

_Nathalie A. Cook_

Nathalie A. Cook

Wo'aff

January. 12, 2001    Please put in Nicholas Hurlin and
                     Nathalie Cook - 27 Central St. File

Town of Rowley Police Department
177 Haverhill Street
P.O. Box 365
Rowley, MA 01969
                    Fax  948-7087 Chief of Police Berry
Dear Chief Berry,

On my reviewing the police report by 14 Daviid Sedgwick on 1/9 at
2145 he failed to mention that Mr. Hurlin had asked for a closed
session at the Rowley Board of Selectmen Meeting but was refused.
Mr. Hurlin talked about his questions at the meeting and what he had
discussed with agencies during the day.

Sedgwick failed to mention that Mr. Hurlin had talked that day to
5 State & Federal agencies and had gone over with them and used p
much the same language and manor as used when talking to Mr. Cost
and the BOS and not one of these agencies where upset about what Mr
Hurlin had said and what they had been discussing.

Mr. Hurlin said this was not about the on going problem with the
but the inconsistent application of the rules and regulations and
they are applied.

I believe Mr. Hurlin mentioned that these people are the policy ma
and if people can not address their grievances to officials them
only way for people to go is through the court system.

Sedgwick failed to mentioned that I was present when Costello retur
Hurlins phone call and Mr. Hurlin had said 3 or 4 times that this
not a threat and tried to explain to Mr. Costello.

I believe I said I had spoken to Mr. Costello close to the end of
their phone conversation and I had asked Mr. Costello "Who wouldn
argumentative over the past years with this problem going on for
years".

Hopefully Sedgwick's 2 way radio might have been on directly to
office so this meeting was on tape and we could verify or correc
errors and omissions on the report.

If Sedgwick disagrees with any of this please have him or you
on this matter.

Thank you,
Sincerely,

Nathalie Cook
Nathalie Cook
P.O. Box 107,  27 Central Street
Rowley, MA 01969
978-948-7411

For Date: 01/08/2001  -  Monday

| Call Number | Time | Call Reason | Action | Priority |
|---|---|---|---|---|
| 01-435 | 1830 | Phone - ASSIST MUNICIPAL AGENCIES | INVESTIGATED | 3 |

Call Taker:  Kenneth Belson
Location:  BENNETT HILL RD
Principal Party:  HURLIN, NICHOLAS @ 441 CENTRAL ST - ROWLEY, MA 01969 978-948-7411
Unit:  14  Sedgwick                          Disp-1830  Arvd-1832  Clrd-1905
Narrative:

Rp requesting to speak with the duty officer.
14 off on Bennett Hill Rd.
---------------------------------------------------------

Attilio Paglia requested that I speak with him
regarding an incident that occurred today between the Board
of Health and Nick Hurlin 419 Central St. Paglia explained
that Charlie Costello (Chairman of the BOH) received a
threat and I should speak with him.  Paglia stated that the
issue would be brought up at the Selectman meeting held at
1930 hours.
I went to Costello's house located on Bennett Hill Rd.
Costello explained that Hurlin came to the office of the
Board of Health during the morning hours and caused a
problem.  Hurlin was asked to leave by the two women
assistants.  Hurlin then went to the Selectmen's office and
caused a disturbance.  Costello was contacted at his work
and was asked to speak with Hurlin.  Costello, the BOH, and
Hurlin have had a long and unstable history.
Costello attempted to contact Hurlin on a couple of
occasions eventually reaching him at approximately 1730
hours.  Costello stated that the conversation began to go
sour until Hurlin finally stated to Costello; "You don't
want what happened in Wakefield?" Costello questioned Hurlin
as to the statement just made.  Hurlin did not take it back
or back down from the statement.
Costello contacted Selectman Madden and Selectman
Paglia before the RPD was contacted.  I observed Costello to
be visibly shaken and disturbed by the threat.  I advised
Costello that threatening of a public official is a crime
and he could be charged.  Costello did not wish to go this
route in fear of upsetting the situation.
I advised Costello to send Hurlin a certified letter.
The letter should include that Hurlin is no longer to
conduct business in person at the BOH office.  A copy of
this letter should be sent to the RPD and selectmen.  I also
advised  Costello that I would take up this matter with
Chief Barry prior to speaking with Hurlin. Chief Barry would
be able to contact the Selectmen Office and develop a plan
for an appropriate response to Hurlin's threat.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10833MBB

NICHOLAS E. HURLIN          )
    Plaintiff                )
                             )
v.                          )
                             )
TOWN OF ROWLEY,             )
    Defendant                )

## AFFIDAVIT OF CHARLES COSTELLO

I, Charles Costello, under oath, state as follows:

1.  I am the Chairman of the Rowley Board of Health. I also held this position on January 8, 2001 when the Plaintiff made what I believed to be threatening statements to me.

2.  The Plaintiff made the threatening statements to me during a telephone conversation. I had called the Plaintiff after learning that he had engaged in disruptive behavior at the Board of Health office earlier that day and was asked to leave by the Health Agent. I was informed that the Plaintiff wanted to discuss his alleged treatment at the Board of Health office that day.

3.  During our conversation, the Plaintiff said something to the effect that he did not want a "Wakefield" or "Colebrook, New Hampshire" to happen in Rowley.

4.  I was shocked and upset by the Plaintiff's statements and believed he was threatening me and / or employees of the Town of Rowley, as he was referring to two well-publicized incidents in which a number of people were shot to death. In fact the Wakefield shootings had occurred only days before the Plaintiff made his statements  In addition, although I had seen the Plaintiff engage in disruptive and argumentative behavior in the past, he had never used such threatening language towards me or other town employees that I was aware of.

5.  After the Plaintiff made his threats, I asked him to repeat what he had said. Rather than withdrawing his threats and apologizing to me, he said something to the effect of "you heard me."

6.  After ending my conversation with the Plaintiff, I called A.J. Paglia who is the Chairman of the Board of Selectmen and who has experience in law enforcement. I informed Mr. Paglia of the threats and then I called the Rowley Police Department.

7.       The Plaintiff appeared at the Rowley Board of Health meeting later that same evening. He was not on the agenda. He stated to the Board of Health that the statements he had made earlier to me were not threats but a request that such a thing not happen. He stated he was angry that his statement was taken as a threat and angry with the Board of Health for not helping him resolve the problem he has.

Signed under the pains and penalties of perjury this 28 day of January, 2005.

_Charles Costello_

Charles Costello